**Affirmed and Memorandum Opinion filed December 4, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00634-CR

---

### SHARARD LAVANN CHAVIS, Appellant,

### V.

### THE STATE OF TEXAS, Appellee.

---

### On Appeal from the 337th District Court
### Harris County
### Trial Court Cause No. 1261199

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Sharard Lavann Chavis of possession with intent to deliver cocaine. Sharard appeals, arguing he was denied the effective assistance of counsel at trial. We affirm.

I

Officer Jeffery Johnson of the Houston Police Department, Narcotics Division, received a tip from a confidential informant ("CI") who believed that drugs were being

sold from a house located at 9314 Sterlingshire in Houston. As the lead investigator on the case, Johnson began doing surveillance of the house to determine whether the tip had merit. He also orchestrated a controlled buy, with the CI playing the role of the buyer. According to Johnson, officers Thomas Chapman and Juventino Castro dropped the CI off near the house and maintained constant visual surveillance of the CI during the transaction. The CI approached the house and was greeted by an unidentified black male who was approximately 6'0"–6'2" tall, weighed approximately 180–200 pounds, had a medium complexion, and appeared to be about 23 to 25 years old. The CI asked the male for a quantity of crack cocaine in exchange for cash. The male walked into the house and returned minutes later with a white chunk that appeared to be, and later tested positive for, crack cocaine, and told the CI to come back if he needed more.

On April 29, 2010, Johnson filed an affidavit detailing the findings of his investigation. A magistrate issued a search warrant based on the affidavit. Later that evening, a team of about six or seven police officers executed the search warrant. When they approached the front door, the officers immediately smelled the strong odor of burnt marijuana. They proceeded into the house through the unlocked door and saw a small child and a woman, later determined to be Sharard's son and his son's mother, sitting on a couch in the living room. The first officer to enter the kitchen found Sharard standing next to an open cabinet in which the officer saw a large quantity of crack cocaine, already cut into smaller portions, and a large amount of cash. The officer also saw visible cocaine residue on a small, digital scale on the counter. In another cabinet, the officer found a large quantity of marijuana that had been divided into small baggies. Another officer found Sharard's brother, Melvin, in a hallway close to a bedroom. Melvin had a loaded pistol in his waistband. When the police searched the bedroom, they found compressed cocaine[1] next to a large bundle of cash and another loaded pistol. At trial, several of the officers testified that the quantity and packaging of the drugs as well as the large amount of cash and the loaded guns in the home led them to believe that the drugs were intended

---

[1] At trial, Johnson explained that compressed cocaine is powder cocaine that has been compressed into a package so it appears hard rather than powdery.

2

for sale rather than for personal use. After finding evidence linking Sharard[2] and Melvin to the house, the officers arrested the brothers and released the woman, child, and a third man they had found in the house. Johnson read Sharard his *Miranda* rights, and Sharard voluntarily said, in reference to the narcotics in the house, "It's not just mine. It's me and my brother's." Sharard told Johnson that he and Melvin both sold drugs out of the house and proceeded to walk around the house with the police officers and showed them where he and Melvin each kept their respective stashes.

Both Sharard and Melvin were indicted for the felony offense of possession with the intent to deliver a controlled substance, namely, cocaine, weighing more than four grams and less than 200 grams by aggregate weight, including any adulterants or dilutants. Melvin pleaded guilty and was sentenced to three years' imprisonment in the Texas Department of Criminal Justice, Institutional Division. Sharard pleaded not guilty, but a jury convicted him and, after he pleaded "true" to an enhancement paragraph, sentenced him to twenty years' imprisonment. Sharard then retained new counsel and filed a motion for new trial, alleging he had been denied the effective assistance of counsel. The trial court held hearing on the motion and ultimately denied it. This appeal followed.

On appeal, Sharard again complains that his trial counsel denied him effective assistance in violation of his Sixth- and Fourteenth-Amendment rights. Specifically, Sharard argues his trial counsel (1) failed to perform any investigation or preparation in the year leading up to trial, (2) failed to perform any meaningful "emergency" investigation and preparation, (3) failed to move to suppress evidence obtained pursuant to the search warrant that led to Sharard's arrest, (4) failed to investigate and call Melvin to testify, and (5) elicited inadmissible prior convictions from Sharard during his testimony and generally failed to prepare him to testify.[3]

---

[2] Specifically, the police found two pieces of mail bearing Sharard's name and that address, his checkbook in a kitchen drawer, a key to the house on his key ring, and a lease to the house in both Sharard and Melvin's names.

[3] Sharard also argues that his trial counsel did not have a written contract with him or assist him

3

## II

In order to prevail on an ineffective-assistance-of-counsel claim, a convicted defendant must show that (1) his trial counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* standards in full). Unless an appellant proves both prongs, an appellate court must not find counsel's representation to be ineffective. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Strickland*, 466 U.S. at 687). To satisfy the first prong, the appellant must identify the acts or omissions of counsel that allegedly were not the result of reasonable, professional judgment and show by a preponderance of the evidence that those acts or omissions were outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690. To satisfy the second prong, the appellant must show a reasonable probability—or a probability sufficient to undermine confidence in the outcome—that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694; *Lopez*, 343 S.W.3d at 142.

Judicial scrutiny of counsel's performance must be highly deferential. *Strickland*, 466 U.S. at 689. A reviewing court must consider the totality of the representation and

---

with his bond revocation. But he fails to suggest how either of these omissions constitutes deficient representation. He further fails to suggest how the omissions affected or even related to his counsel's effectiveness during his trial on the merits. Accordingly, we do not separately consider either of these issues. Similarly, Sharard argues that one of his counsel, Joseph Libby, committed a number of "gaffes" during trial, such as appearing disorganized during voir dire, referring to Sharard as "this defendant," failing to ask the veniremembers about their perceptions of the presumption of innocence and of non-testifying defendants, spelling Sharard's name wrong on the motion for the jury to assess punishment, and misstating the facts regarding whose birthday party Melvin hosted on the afternoon before the police executed the search warrant. The *Strickland* standard has never been interpreted to mean that the accused is entitled to errorless or perfect counsel. *In re Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986). What's more, we doubt that Libby was deficient by referring to a criminal defendant as "this defendant"; by misspelling a defendant's name on one document, particularly one that never went before the jurors; or by failing to ask the veniremembers about their perception of a non-testifying defendant given that Sharard testified. Because Sharard fails to suggest how these "gaffes" constituted professionally unreasonable conduct, let alone how they prejudiced the outcome of the trial, they do not support his claim of ineffective assistance of counsel.

the facts and circumstances of the particular case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Further, the court must assess the reasonableness of counsel's conduct viewed as of the time of that conduct and avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689–90; *Ingham v. State*, 679 S.W.2d 503, 508 (Tex. Crim. App. 1984). Because of the inherent difficulty in making this decision, there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142. To overcome this presumption, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. When the record is silent as to trial counsel's strategy, an appellate court will not conclude counsel's assistance was ineffective unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). When, as here, a defendant asserts ineffective assistance of counsel in a motion for new trial, we review the trial court's denial of the motion for an abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004); *superseded in past on other grounds by rule*, *State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007).

III

In Sharard's first, second, and fourth issues, he argues that James Dyer and Joseph Libby, his trial counsel, failed to perform any investigation or preparation in the year leading up to the trial, specifically referring to the fact that they neither visited the scene nor interviewed Melvin or called him to testify at trial. Sharard also argues that Libby failed to conduct any "emergency" investigation and preparation on the day of his trial. For their part, Dyer and Libby maintain that did prepare and were "as ready as [they] could be." Because these issues all relate to Libby and Dyer's legal duty to investigate and prepare for trial, we consider them together.

## A

A criminal defendant's trial counsel has a duty to either make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691; *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996) (per curiam); *overruled on other grounds*, *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). We consider counsel's decision not to investigate or to limit the scope of an investigation with a great deal of deference to counsel's judgment, looking to the reasonableness of the decision in light of the totality of the circumstances. *Strickland*, 466 U.S. at 691; *McFarland*, 928 S.W.2d at 501. The defendant's own statements and actions substantially influence the reasonableness of counsel's actions, and when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. *Strickland*, 466 U.S. at 691. The decision to call a witness to testify is generally a matter of trial strategy, but the failure to interview a witness falls below an objective standard of reasonableness when such inaction precludes an accused from advancing any viable defense. *Perez v. State*, 14-07-00414-CR, ___ S.W.3d ___, 2008 WL 5220302, at *4 (Tex. App.—Houston [14th Dist.] Dec. 11, 2008), *aff'd*, 310 S.W.3d 890 (Tex. Crim. App. 2010); *State v. Thomas*, 768 S.W.2d 335, 337 (Tex. App.—Houston [14th Dist.] 1989, no pet.). Nevertheless, a conviction will not be reversed based on the failure to investigate unless the consequence of that failure is that the defendant's only viable defense is not advanced and there is a reasonable probability that, but for the failure, the result of the proceeding would have been different. *McFarland*, 928 S.W.2d at 501.

## B

Following Sharard's arrest, he sought legal counsel from the law firm of Dyer & Libby. James Dyer and Joseph Libby have been the sole partners at the firm since 1976. Sharard worked exclusively with Dyer until the day of his trial, when, to Sharard's surprise, Libby rather than Dyer appeared on his behalf.

At the hearing on Sharard's motion for new trial, Dyer testified that he and Libby work together on all of the firm's cases, including Sharard's, and that their policy is for clients to hire the firm rather than either partner individually. Similarly, Libby testified that he and Dyer worked on Sharard's case together from the time Sharard hired the firm. Libby explained that their preparation included reading the offense reports and the search warrant, assigning an investigator to contact witnesses and bring them to the office when necessary, meeting with the defense witnesses prior to trial, and discussing strategies and theories of defense with each other as well as with the investigators and paralegals in their office. Dyer also met with Sharard regarding the status and progress of the case every time they went to court, which was at least seven or eight times.[4] During this time, Libby and Dyer developed two interrelated theories of defense for Sharard's case: that all of the drugs were Melvin's, and that Sharard always "fessed up" when he was charged with an offense of which he was guilty. A critical strategy to advancing these theories was to prevent the jury from hearing evidence of Sharard's oral confession to Johnson, which Libby successfully accomplished. Although he did not cite a particular rule or statute in his objection, Libby presumably relied on article 38.22, section 3, of the Texas Code of Criminal Procedure, which provides that no oral statement of an accused made as a result of a custodial interrogation shall be admissible against the accused in a criminal proceeding unless, among other things, an electronic recording is made of the statement. Tex. Code Crim. Proc. art. 38.22, § 3. Nevertheless, such statements are admissible if they have "a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law." *Id.* art. 38.22, § 5.

Sharard specifically complains that Dyer and Libby never went to the scene of his arrest as part of their investigation. But the record is silent as to their strategy for this omission, and we do not conclude that any competent attorney would have visited the

---

[4] Sharard cites the concurring opinion from *Foley v. State* for the proposition that failing to meet with a client more than once outside of court falls below an objective standard of reasonableness. 327 S.W.3d 907, 917 (Tex. App.—Corpus Christi 2010, pet. ref'd) (Yanez, J., concurring). But the majority opinion in that case makes no such conclusion, and we do not find the concurrence persuasive in the circumstances of this case.

house in this case, particularly because the police had removed the evidence and Sharard has never suggested what Dyer and Libby may have found at the house that would help his defense. *See Goodspeed*, 187 S.W.3d at 392; *Garcia*, 57 S.W.3d at 440. Further, because Sharard has not pointed to any defense, let alone his only viable defense, that was not advanced at trial due to Dyer and Libby's failure to visit the scene, this omission does not warrant a reversal of Sharard's conviction. *See McFarland*, 928 S.W.2d at 501.

Neither Dyer nor Libby interviewed Melvin, but Dyer testified that he spoke with Melvin's attorney about the case. During the motion for new trial, Libby testified that one reason he did not want Melvin to testify was because Libby was concerned that if Melvin contradicted Sharard's oral confession, it might become admissible as a prior inconsistent statement. Although Libby misapplied the prior-inconsistent-statement hearsay exception—which allows only a prior inconsistent statement that was made under oath to be admitted against the declarant—the State could have introduced Sharard's oral confession to impeach Melvin pursuant to article 38.22, section 5. *See* Tex. R. Evid. 801(e)(1); Tex. Code Crim. Proc. art. 38.22, § 5. By the same token, the State could have introduced the confession to impeach Sharard, who chose to testify at trial, but Libby did not have the authority to prevent Sharard from testifying. *Florida v. Nixon*, 543 U.S. 175, 187 (2004) ("A defendant . . . has 'the ultimate authority' to determine 'whether to plead guilty, waive a jury, testify on his or her own behalf, or take an appeal.'") (citations omitted).

In addition to Libby's efforts to prevent the State from introducing Sharard's confession, his knowledge of that confession led him to doubt Melvin's truthfulness. Accordingly, Libby testified that he did not believe it was prudent to take the risk of giving an experienced prosecutor the opportunity to cross-examine Melvin and "expose what may have been a lie, shall we say." Libby further noted that Melvin was not an ideal witness because his testimony would allow the prosecutor to go over the details of the search again in front of the jury, which Libby believed "would just exacerbate the evidence [the State] already had." Libby also explained that Melvin had a previous felony

8

conviction, which the prosecutor could have used to impeach him, so it was part of Libby's strategy to advance Sharard's defense through other witnesses who could not be similarly impeached. Specifically, Libby called Sharard's mother, Shawn Chavis, to the stand and elicited testimony from her that Sharard lived with her at 8719½ Lakewood in Houston, which is also the address that appeared on the checkbook bearing Sharard's name that police found in Melvin's kitchen. And, although the court would not allow Libby to introduce evidence of Melvin's guilty plea, Shawn gave general testimony that Melvin was incarcerated for dealing drugs out of his Sterlingshire house. Shawn further testified as to Sharard's character for truthfulness. Libby also called Sharard's girlfriend, Christina Lee, to testify that Sharard lived with Shawn rather than with Melvin and that Sharard did not spend much time at Melvin's house. Through these witnesses, Libby advanced the theory that the drugs belonged to Melvin without relying on Melvin's testimony.

Sharard also claims that Libby did not know until the morning of the trial that he would be conducting the trial, yet he failed to conduct meaningful "emergency" investigation and preparation. But Libby explained he had hopes, as he always does, that Sharard's case might be resolved without trial, which is why he testified that he did not know with certainty that Sharard's case would go to trial until that morning. That does not mean, however, that Libby was unprepared to go to trial. As previously explained, Libby worked with Dyer throughout the entire course of Sharard's case. Dyer left town about ten days before the trial and had already arranged for Libby to appear on Sharard's behalf. Further, although Libby only specifically remembers talking to Shawn, he testified that he spoke with all of Sharard's defense witnesses before the trial, and neither Shawn nor Christina testified to the contrary.

Therefore, we hold that the trial court did not abuse its discretion by concluding that Sharard failed to prove that Dyer and Libby's preparation and investigation for trial was deficient. We overrule Sharard's first, second, and fourth issues.

9

## IV

In his third issue, Sharard argues that Libby denied him the effective assistance of counsel by failing to move to suppress the drugs that police found pursuant to the search warrant when testimony of officers Chapman[5] and Castro allegedly contradicted the information in Officer Johnson's search-warrant affidavit. Libby testified that he did not perceive any possible grounds for suppression during trial.

## A

To satisfy *Strickland*, an appellant alleging his trial counsel was ineffective for failing to file a motion to suppress must show by a preponderance of the evidence that the motion would have been granted and that it would have changed the outcome of the case. *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998) (per curiam); *Thomas v. State*, 352 S.W.3d 95, 104 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The probable-cause standard requires that an affidavit set out sufficient facts for a magistrate to conclude that the item to be seized will be on the described premises at the time the warrant issues and the search is executed. *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011); *Schmidt v. State*, 659 S.W.2d 420, 421 (Tex. Crim. App. 1983). There is an obvious assumption that the showing required by the Fourth Amendment must be truthful, but that is not to say that every fact in a supporting affidavit must necessarily be correct. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). Rather, because probable cause may be founded upon hearsay, information received from informants, or information within the affiant's personal knowledge that sometimes must be garnered hastily, the affidavit must be truthful in the sense that the affiant believes or appropriately accepts the information as true. *Id.* at 165. There is a presumption of validity with respect

---

[5] Chavis's brief refers to "Officer Thompson," but there is no officer by that name involved in this case. It is apparent from the context, however, that Chavis means to refer to Officer Chapman.

to search-warrant affidavits. *Id.* at 171.

In *Franks v. Delaware*, the Supreme Court stated that a criminal defendant who challenges a search-warrant affidavit is entitled to an evidentiary hearing only if certain requirements are met. *Id.* at 171–72. First, the challenger must allege deliberate falsehood or reckless disregard for the truth by the affiant, pointing to a specific portion of the affidavit that is allegedly false. *Id.* at 171. Allegations of negligence or innocent mistake in the affidavit are insufficient. *Id.* Further, the challenger must accompany the allegations with an offer of proof and a statement of supporting reasons. *Id.* Finally, the challenger must show that, absent the allegedly false information, the remaining contents in the affidavit are insufficient to support a finding of probable cause. *Id.* at 171–72. If all these requirements are met, the challenger is entitled, under the Fourth and Fourteenth Amendments, to his evidentiary hearing. *Id.* at 172.

B

Before filing his affidavit, Johnson had been conducting surveillance of 9314 Sterlingshire and determined that the house was in the charge of and controlled by an unknown black male with a medium complexion who weighed approximately 180–200 pounds, was approximately 6'0"–6'2" tall, and appeared to be about 23 to 25 years old. In the affidavit, Johnson stated that "within the last 48 hours," he had met with a reliable CI.[6] Johnson attested that the CI assisted him in conducting a controlled buy from that house and explained that Chapman and Castro dropped the CI off in the area of the home and maintained visual surveillance while the CI went to the house, met with the unknown black male in the driveway, and purchased crack cocaine from him. Johnson attested that Chapman and Castro then picked up the CI and took possession of the narcotics he acquired. The CI later told Johnson the details of the controlled buy, including that the unknown male told the CI to come back if he needed more. Johnson also noted that the

---

[6] Johnson's affidavit specified that Chapman and Castro had received information from this CI a number of times before and that the CI's information, which had always proved to be true and correct, had led to many arrests and narcotics seizures. Johnson also attested that the CI could recognize crack cocaine by sight and smell from past experience in using the drug.

area of 9314 Sterlingshire is an area known by law-enforcement officers for the distribution of crack cocaine.

At trial, Castro testified that he was not present for a controlled buy at 9314 Sterlingshire. This does not prove, however, that Johnson deliberately or recklessly included false information in his affidavit. Rather, Johnson may have made an innocent mistake or negligently named the wrong officer.

Chapman testified: "I believe—if my memory serves me correctly—I'd been to this location on at least two prior occasions the week before [the search warrant was executed]," which is inconsistent with Johnson's statement in his affidavit that Chapman helped with surveillance within 48 hours of Johnson filing the affidavit. But this testimony does not even prove that Johnson's information was false, let alone deliberately so: Chapman was testifying based on his memory of events that took place 14 months earlier, he admitted that he was uncertain about the timeline of his surveillance on this particular house, and he did not expressly deny doing surveillance of the controlled buy. Again, even if the information was incorrect, the record does not prove that Johnson deliberately or recklessly included false information in the affidavit. And when Libby questioned Johnson about Castro's and Chapman's testimonies, Johnson maintained: "I'm the one that orchestrated the controlled buy. They assisted in the surveillance of it," which supports the presumption that he believed the information to be true.

Therefore, the trial court did not abuse its discretion by concluding that Libby was not ineffective for failing to file a motion to suppress the drugs. For the reasons discussed above, Sharard failed to prove by a preponderance of the evidence that the motion would have been granted. We overrule Sharard's third issue.

V

In Sharard's fifth and final issue, he argues that Libby denied him the effective assistance of counsel by failing to prepare Sharard to testify, particularly regarding his

12

criminal history; by eliciting testimony from Sharard regarding four inadmissible prior convictions; and by failing to object when the prosecutor elicited details of Sharard's prior convictions.

A

During the motion for new trial, Libby was asked whether he discussed the substance of Sharard's testimony with him prior to Sharard taking the witness stand, and Libby replied, "Yes. Yes. Yes." Libby specifically testified that he told Sharard to tell the truth. When asked whether he reviewed Sharard's criminal history with him, Libby replied, "I think I did, yeah. I'm not recalling that specifically; but I would think I did, yeah." Libby also testified that Sharard ultimately made the decision to testify. Sharard did not testify to rebut this testimony, and his confusion about some of his prior offenses[7] is not sufficient to show that Libby failed to prepare him to testify. Accordingly, the record does not suggest that Libby failed to prepare Sharard to testify.

B

Prior convictions for felonies or for crimes involving moral turpitude are admissible to impeach a witness's credibility for truthfulness if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party. Tex. R. Evid. 609(a). A defense counsel eliciting testimony from the accused as to his prior conviction can be a matter of sound trial strategy, if the prior conviction is admissible. *Huerta v State*, 359 S.W.3d 887, 891 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Indeed, it is common practice for defense attorneys to elicit such testimony because doing so removes the sting from an attack that would otherwise come from the State. *Id.* at 891–92. If the prior conviction is inadmissible, however, there can be no reasonable strategy for introducing it before the jury. *Robertson v. State*, 187 S.W.3d 475, 485–86 (Tex. Crim. App. 2006); *Huerta*, 359 S.W.3d at 892.

---

[7] For example, Sharard has two prior offenses for driving with a suspended license, which occurred within one month of each other. When the prosecutor asked him about his sentence for the first of these offenses, he mistakenly answered 100 days, which was actually the sentence he received for the second.

Sharard concedes, and we agree, that four of his eight prior convictions—one felony conviction for burglary, one misdemeanor conviction for failing to identify himself to a peace officer, and two misdemeanor convictions for theft—were admissible for the purpose of impeachment. *See* Tex. R. Evid. 609(a); *LaHood v. State*, 171 S.W.3d 613, 620 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (stating that theft is a crime of moral turpitude involving deception); *Lape v. State*, 893 S.W.2d 949, 958 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (explaining that a witness's conviction for making a false report involved deception and therefore is a crime of moral turpitude). But he argues that his remaining four prior misdemeanor convictions—one for possession of marijuana, one for carrying a deadly weapon, and two for driving with a suspended license—were inadmissible. Because none of these offenses are felonies or crimes of moral turpitude, we agree. *See In re Lock*, 54 S.W.3d 305, 306 (Tex. 2001) ("[P]ossession of a controlled substance is not a crime of moral turpitude."); *Stephens v. State*, 417 S.W.2d 286, 288 n.1 (Tex. Crim. App. 1967) (stating that driving with a suspended license is not an offense involving moral turpitude). Therefore, there could have been no reasonable strategy for introducing them before the jury and doing so constituted deficient performance. *See Robertson*, 187 S.W.3d at 485–86.

Having concluded that Libby was deficient, we must now consider the second *Strickland* prong and determine whether there is a reasonable probability that, but for Libby's error, the result of the proceeding would have been different. In his brief, Sharard insists that he was prejudiced because "1) his testimony was crucial to the defense, 2) improper impeachment permeated and eviscerated his testimony, and 3) the State focused on it in closing."

As previously mentioned, Sharard's mother and girlfriend testified on his behalf during trial, and Sharard does not suggest what, if any, testimony that only he could have offered. Shawn testified that Sharard was a truthful person, and she also testified that she knew about his prior convictions, so it seems that she could have testified that he always pleaded guilty when he was charged with a crime that he had committed.

14

On direct examination, after Sharard acknowledged his prior convictions, he testified that all of the drugs that the police found belonged to Melvin and that he did not even know there were drugs in Melvin's house. He explained that he was at Melvin's house when the police arrived because Melvin had hosted a family birthday party earlier that day, which Sharard had attended. On cross-examination, however, Sharard volunteered the fact that after the other attendees left the party, he stayed and smoked marijuana with Melvin, directly contradicting his previous testimony that he did not know there were drugs in the house. Further, it is difficult to imagine that Sharard was prejudiced by the jurors hearing about his previous conviction for possession of marijuana in any substantial way beyond the prejudice that he imposed upon himself by volunteering that he smoked marijuana with Melvin.

During closing argument, the prosecutor's primary emphasis was on the testimonies of the police officers and the evidence that they found in the house. The prosecutor also attacked Sharard's credibility, citing both his criminal history and the fact that Sharard expressly contradicted himself on the stand regarding whether he knew there were drugs in the house. When the prosecutor stated, "I hope y'all are noticing a pattern here," implying that the jury could use Sharard's criminal history as character evidence, Libby objected and stated that the jurors were "instructed not to consider that evidence on innocence or guilt, only to test his credibility." The court sustained this objection. Therefore, although the prosecutor referenced Sharard's inadmissible prior convictions during closing argument, they were not the focus of the argument, and Libby mitigated the prejudicial effect of the evidence with the limiting instruction. For these reasons, there is not a reasonable probability the result would have been different if Libby had not elicited testimony regarding the four inadmissible prior convictions.

## C

In this case, the prosecutor elicited testimony from Sharard regarding the underlying details of his prior convictions. The details of a prior conviction are generally inadmissible for impeachment purposes. *Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim.

15

App. 1986). But counsel's mere failure to object does not rebut the presumption that he was acting according to sound trial strategy. *Huerta*, 359 S.W.3d at 894 (explaining that counsel may permit such testimony in an effort to make appellant appear more honest and forthright, to minimize the seriousness of the earlier offense, or to avoid drawing unwanted attention to a particular issue).

Libby testified that he did not object because he "thought it was good for [Sharard] to be as forthcoming as possible, to represent to the jury and the court that there was reason to rely on his testimony." That Sharard understood this strategy is supported by the fact that when the prosecutor specifically asked him whether he thought the jury should hear all of the details of his prior offenses, Sharard replied, "Yes, ma'am." Additionally, although the evidence about all of Sharard's prior convictions was prejudicial, the prejudice was much more attributable to the admissible prior convictions, which involved deception and resulted in harsher punishments,[8] than it was to the inadmissible prior convictions, which did not involve deception and resulted in more lenient punishments.[9] Therefore, his testimony about the details may have minimized the seriousness of those offenses.

We conclude that Libby was not deficient for failing to object to the State's questions regarding the underlying details of Sharard's criminal history. Although it was professionally unreasonable for Libby to elicit testimony from Sharard regarding four inadmissible prior convictions, there is not a reasonable probability that Libby's error had a substantial and injurious effect or influence on the jury in determining their verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Even if the State had been precluded from discussing the inadmissible convictions, Sharard was still subject to impeachment by four admissible prior convictions, and Libby attempted to mitigate the

---

[8] Sharard testified that he served two years in jail for his burglary conviction, six weeks for his first theft conviction, two days for his second, and that he did not recall how long he spent in prison for failing to identify himself to a peace officer.

[9] Sharard testified that he served only two days in jail for possessing marijuana; ten and 100 days in jail for his two convictions for driving with a suspended license, respectively; and was released on bond after his conviction for possessing a deadly weapon.

16

prejudicial effect of Sharard's criminal history with a limiting instruction. Sharard also impeached himself by explicitly contradicting his own testimony on the witness stand. Additionally, the weight of the evidence against Sharard was strong. Therefore, having considered the totality of the circumstances, we conclude that there is not a reasonable probability that the outcome of the trial would have been different but for Libby's professionally unreasonable introduction of Sharard's four inadmissible prior convictions.

* * *

We conclude that the trial court did not abuse its discretion in holding that Sharard was not denied the effective assistance of counsel. Accordingly, we affirm.


/s/     Jeffrey V. Brown
        Justice


Panel consists of Chief Justice Hedges and Justices Brown and Busby.

Do Not Publish — TEX. R. APP. P. 47.2(b).

17